ROBINSON et al. v. TUBULAR WOVEN FABRIC CO.

(District Court, D. Rhode Island. March 31, 1917.)

No. 6.

1. PATENTS ⟨=⟩328—INFRINGEMENT—FLEXIBLE ELECTRICAL CONDUIT.

The Osburn patent, No. 652,806, for a flexible electrical conduit, covers a structure which shows invention over the prior art only in that it retains a tubular form with sufficient circumferential rigidity to resist collapse under the ordinary conditions of its use, and that this rigidity is due in a substantial sense to the helical member in the woven fabric of which it is composed. So construed, the patent *held* not infringed by a structure of soft woven fabric, easily collapsible, to which rigidity is imparted by passing it through a bath of water-resisting compounds.

2. PATENTS ⟨=⟩226—INFRINGEMENT—ABSTRACT CLAIMS.

The right of a patentee to exclude others from the use of old and familiar mechanical combinations and structures must be carefully restricted, and the duty rests upon the courts to guard the rights of the public against that form of unjust monopoly which may result from sustaining highly abstract claims.

3. PATENTS ⟨=⟩37—NOVELTY—USE OF OLD ELEMENTS IN NEW COMBINATION.

If a thing is old, and is applied to perform its old functions, it remains in the prior art, and cannot be made novel, in the sense of the patent law, merely because used in new surroundings, that do not affect its character or mode of operation.

4. PATENTS ⟨=⟩165—INFRINGEMENT—TERMS OF CLAIM.

The questions of invention and of infringement are not verbal questions, and neither can be determined by the test of the words used in the patent claims.

5. PATENTS ⟨=⟩16—INVENTION—REMEDYING OF DEFECTS IN MECHANICAL STRUCTURES.

Mending a known and specific defect, and thereby restoring a part to its intended relation to other parts, or strengthening weakness of construction, does not, except in very unusual cases, entitle one to rank with inventors who have solved some problem peculiar to a special art.

In Equity. Suit by W. C. Robinson and others against the Tubular Woven Fabric Company. On final hearing on supplemental bill. Bill dismissed.

Charles F. Perkins, of Boston, Mass., for plaintiffs.

William Quinby, of Boston, Mass., for defendant.

BROWN, District Judge. [1] The plaintiff, having secured an injunction on the patent to Osburn, No. 652,806, July 3, 1900, for flexible electric conduit, in accordance with the opinion of the Circuit Court of Appeals for this Circuit (227 Fed. 884, 142 C. C. A. 408, reversing [D. C.] 225 Fed. 50), now contends that a new construction

made by the defendant is identical in the eye of the patent law with that formerly held an infringement. This the defendant denies, contending that the plaintiff seeks a broader construction of the claims than in the former case, thus opening questions not therein decided.

The defendant's tubing is thus fairly described:

"The uncontradicted evidence shows that defendant's tubing complained of —so-called large weft tubing—is composed entirely of soft woven fabric, which, after weaving, is saturated with compounds required by the Underwriters.

"The yarns of which the fabric is composed are all of cotton and untreated prior to weaving. The twist of the yarns is light, only sufficient to permit weaving. The fabric is purposely loosely woven, and, when woven, is, as a direct and necessary result of the untreated fiber of the yarns, the loose twist of the yarns, and the loose, open weave, soft, flexible, and easily collapsible. The weft has the same characteristics as the warp; it is soft, collapsible, and without capacity to retain a tubelike form, or maintain itself in the plane of, or as, a helix. The tube, after weaving, is not usable as an electric conduit under the Underwriters' rules. * * * Underwriters' Rule 63, Defendant's Exhibit 3–B. The woven tubes satisfy one of the eight requirements of the Underwriters' rule; to wit, C, relating to longitudinal strength. * * *

"The tube, after it is woven, is passed lengthwise through a hot molten bath or mass of saturating, water-resisting compounds. The speed with which the tube is passed through this bath is regulated, so that the yarns of both warp and weft alike, and, at the same time, may be saturated sufficiently to comply with the Underwriters' requirements, without the liquid material running into and thus obstructing the bore of the tube.

"It is important to note that, in the allocation of this water-resisting, saturating compound, the tube, as a whole, is treated—warp and weft alike—and simultaneously. As a result of this first compounding treatment, the tube is not only rendered water-resistant, but is stiffened and given a part of the necessary radial strength. It is then treated with a fireproofing compound."

It becomes necessary to consider the scope of the decision of the Circuit Court of Appeals. It held that the claims of the patent in suit were not anticipated by prior conduits having the same elements combined in the same way, because none of those structures "were suitable to answer the purpose of a flexible electrical conduit"; that the claims, though in terms for "conduits," were limited to "electrical conduits," or "flexible electric conduits"; and also held that:

"By the introduction into this art of means for securely interlocking the turns of the helical members and rendering them incapable of further separation, and by the same means producing a smooth lining for the tubing, the device of the patent performed a new function and accomplished a new and beneficial result."

The terms "electrical" or "electric," as used in the Osburn patent, are somewhat misleading, since they might imply insulating qualities in the members of the combination and the function of insulating the electricity-bearing wires. The art of insulating electric wires, however, is not the art to which the claims of the Osburn patent relate.

It is conceded that the claims are not limited to a conduit which has insulating qualities, but cover broadly a mechanical structure having mechanical properties and functions only. The only significance of the term "electrical" is in its reference to the use of the conduit as a container of conducting wires.

It is true that the Circuit Court of Appeals makes reference in italics to language in the specification which refers to insulating properties of the materials; but this was merely on the question of whether the claims refer to conduits in general (in which case they might be anticipated by prior art conduits for other purposes), or to flexible conduits limited to the purpose of forming a miniature tunnel, raceway, or tube to receive and protect from injury insulated electric lighting conductors within them.

This art into which Osburn's device was introduced was the art of flexible conduits for conductors of electricity, and not the art of insulated or insulating conductors.

The references to additional advantages that might be derived from using mechanical elements which have insulating qualities are merely incidental, and form no part of the patented invention. Steel and wire, as well as materials having insulating qualities, are referred to in the specification. Semiflexible materials, insulating or noninsulating, are expressly made equivalents for performing the mechanical functions of the Osburn mechanical conduit.

In Locke Insulator Mfg. Co. v. Ley (C. C.) 143 Fed. 911, 913, affirmed on the opinion of the court below by this Circuit Court of Appeals, 143 Fed. 985, 75 C. C. A. 171, it was said:

"As it is conceded that the claims would be equally infringed, whether the base were composed of high insulating material or of noninsulating material, in determining the question of invention we must consider only those features common to bases of insulating and of noninsulating material, namely, mechanical features."

The purpose of the conduit is to give mechanical protection and to permit mechanical movements, and the art is that of making a structure for that purpose. There is absolutely no electricity in the art of the claims in suit. It is impossible to place any other construction upon the language of the court without assuming that it fell into a grave error. It is true that the summary dismissal by the court of the prior art and of the old "semiflexible helical weft members in seamless woven tubes and flexible warps interwoven with a semiflexible weft," because "none of the structures were suitable to answer the purpose of a flexible electrical conduit," may give rise to some doubt as to the reasons why they were found not suitable. But we cannot entertain the assumption that this was because of any features relating to insulation or to the conduction of electricity, since that would be contrary to the plaintiff's concessions, and a plain error.

We must assume, therefore, that it was because of some unsuitableness to perform the mechanical functions of the conduit.

It would have assisted the District Court, had it received the specific instruction of the Circuit Court of Appeals upon this point; and this court is left to conjecture how the court arrived at this conclusion as a matter of fact, without also arriving at the conclusion that the structure of the broad claims in suit was also unsuitable to answer these purposes and perform the same mechanical functions.

The opinion points out defects in the structure of the Herrick patent, No. 456,271, of 1891, namely, that it did not provide means for

the prevention of the separation of the turns of its spiral lining in case a strain is exerted on the end of the spiral, instead of on the whole conduit, or on the covering. By this must be meant, however, effective means; for Herrick shows means for doing this, namely, a protective strip. The improvement was in weaving together spiral and longitudinal members, thus effectually preventing dismemberment of those two parts. Though Herrick discloses the conception of combining the spiral strip and a protective wrapping, he does not disclose the use of weaving to unite the turns of the spiral lining of his conduit. It is clear, however, that Herrick brought into, or at least used in, the art of constructing flexible conduits for conducting wires, a seamless woven tube, nonextensible in itself, and used it, not only as a nonextensible member, but also to render the whole conduit nonextensible so long as the parts of his conduit remained in their intended relation and were not dismembered by violence.

Nonextensible woven tubes were introduced into or used in this art in the most conspicuous manner. The trade-name by which Herrick's conduit was known was "Circular Loom," and it was sold under this name in large quantities for many years. The circular loom itself was thus brought into the art, as well as its product, for the reason that the product of the circular loom was in its nature and by reason of the principle of operation of the machine which produced it composed of two interwoven and inseparable parts, making it a unitary structure that resisted dismemberment and was nonextensible. The use of the name "Circular Loom" was descriptive of the product.

Upon an attempt to register the name as a trade-mark such registration was denied; the Supreme Court of the District of Columbia saying that, although not the entire product, but only a material part of the construction, was the product of a loom, "to this extent, the words 'Circular Loom' are clearly descriptive of one of the chief ingredients or characteristics of the conduits to which they are applied." In re American Circular Loom Co., 28 App. Cas. D. C. 450, 452.

As it is a generic feature of all tubular products of the circular loom that the spiral member or weft, and the longitudinal members, or warps, are interwoven, thus resulting in a nonextensible structure which resists dismemberment, it follows necessarily, whatever may be the differences between warp and weft, and whatever the range for selecting for a particular art old loom products with differences in warp and weft, that the introduction into the art of a woven tube of any kind, having the generic characteristics of all woven tubes, anticipates, so far as these features are concerned, all tubes subsequently used in that art. There may be left some room for invention of a tube suitable in other features, but no room in respect to use of the generic features common to all products of the circular loom.

Osburn, therefore, did not teach the art how to make a tube nonextensible, nor how to prevent dismemberment of a tubular conduit. This was old in the art of flexible electric conduits.

Herrick's patent shows, therefore, that if ever there was such a remoteness between the art of weaving tubular fabrics, or the art of weaving tubes for conduits, and a subart of constructing flexible con-

duits for electric wires, that made it an invention to think that the two arts might be united, Herrick had bridged over whatever gap there was between these arts and advertised the union of these arts by calling his product "Circular Loom"; and it was then too late for Osburn to claim invention by the transfer of an old woven structure to a new art merely as a means of preventing dismemberment of a conduit and of rendering it nonextensible.

As was said in the opinion of the Circuit Court of Appeals for the Sixth Circuit, in Crown Cork & Seal Co. v. Sterling Cork & Seal Co., 217 Fed. 381, 133 C. C. A. 297:

"The conception which lay at the bottom of plaintiff's 1898 patent, viz., that he could go to the yielding plunger art, or to some specific art, and adopt a yielding plunger as an element of a bottle-sealing machine, was a meritorious conception. * * * Having gone into the yielding plunger art, and adopted and adapted the hydraulic cylinder yielding plunger into and for a bottle-sealing machine, and having thus bridged over whatever gap there was between bottle-sealing machines and yielding plungers, and having thus incorporated the two arts together, he could not the next year adopt a mechanical trip-yielding plunger to bottle-sealing machine use and then get a valid patent covering any kind of a mechanical trip-yielding plunger when used in a bottle-sealing machine."

The opinion quotes also Judge Killits' language in (D. C.) 210 Fed. 26:

"But, when Painter patented the mechanism alleged to be infringed in this case, the art of bottle sealing by crowns had already invaded the art of yielding pitman, of which the known forms were many, and had made an appropriation therefrom. * * *

"Whatever may be the merits of his invention we find nothing in the grant which shuts the door of opportunity to some other inventor to go to the yielding plunger art for an old device of this character."

See, also, Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856.

If the same inventor cannot twice bridge the gap between the arts, it follows equally that a subsequent inventor cannot claim invention in this respect after a previous inventor has combined the arts.

It was not an invention for Osburn to think of going to the art of weaving flexible tubes, because Herrick told him in express terms what he would find there.

There remained for Osburn's later patent, not broadly the adoption of weaving from another art, but only the adaptation of weaving to one of the members of Herrick's conduit; i. e., his spiral lining.

But the art of flexible electrical conduits as it existed before Osburn is not confined to Herrick's device, even if it be assumed that Herrick's tube was the only one in actual use. The prior art shown in this case includes also the patented art. An invention is completed, and, in the eye of the law, reduced to practice, when the application is filed. After the issue of a patent it is in the art, and negatives novelty of subsequent devices to the same extent as if the patented invention had been manufactured and used.

This question has been thoroughly discussed by the Circuit Court of Appeals for this circuit in Automatic Weighing Mach. Co. v. Pneu-

matic Scale Co., 166 Fed. 288, 293 et seq., 296, 92 C. C. A. 206, in an opinion by Judge Colt (citing the Telephone Cases, 126 U. S. 1, 535, 8 Sup. Ct. 778, 31 L. Ed. 863), and is also considered by that court in McCreery Eng. Co. v. Mass. Fan Co., 195 Fed. 495, 115 C. C. A. 408. The conceptions disclosed in such patents negative novelty in similar conceptions by subsequent inventors.

The Bergman patent, No. 603,230, April 26, 1898, discloses and illustrates by drawings a conduit the foundation of which is a tubular woven tube. The fact that such a tube is thus disclosed cannot be belittled by the fact that he also proposes the use of knitted and braided tubes. He says that the tubes have "warp threads and woof threads, which may be combined in any manner well known in the art."

Woven tubes, when used, will resist separation of the turns of a spiral member and dismemberment of the parts.

The Osburn conduit shows no novelty in the means by which the turns of a spiral member were held together, but only novelty in so uniting the turns of a stiff helical or weft member, for a special use. Does it show novelty in the avoidance of obstructions in the tube such as those peculiar to Herrick's construction? What are those obstructions? The conductor, it is said, when drawn into the Herrick conduit, might catch on the edge of a coil of fiber, and the friction due to this would cause the elongation of the helical member, and thus contraction of its diameter. This, however, as is pointed out, is a peculiarity of Herrick's two-piece construction. It is not a feature of Herrick's outer tube, nor of Bergman's tube, patent No. 603,230, of 1898. It is due to the use of an interior spiral element without weaving the turns together. Osburn mended these defects of Herrick by the use of weaving to unite the turns, thus preventing dismemberment, as well as stretching and consequent reduction of the interior diameter.

But there was another very simple way to avoid these defects, namely, to pull out the spiral entirely and discard it.

This method was practiced extensively—so extensively that the Underwriters, after a number of years, barred the Herrick tube until it was modified by making perforations so that only short lengths of the spiral lining could be pulled out.

By using for a conduit either Herrick's outer tube or Bergman's tube, these defects of dismemberment by violence, and consequent obstruction to the passage of the wires, are avoided; and both of these were in the art of flexible electric conduits before Osburn. The evidence shows beyond question that a tube which remedied both of these defects was well known and was used in the prior practical art long before Osburn.

It was a common practice to use the Herrick outer tube as a flexible electric conduit. This is established by evidence of the plaintiff, as well as by evidence of the defendant. Plaintiff's witness Osburn testified as follows, concerning removal of Herrick's spiral lining:

"Cross-Int. 427. This pulling out of the helical member was ordinarily done before the wire was inserted, was it not? Ans. Yes.

"Cross-Int. 428. And how early was that practice called to your attention? Ans. I would say about 1896 or 1897.

"Cross-Int. 429. That is to say, the construction was such that the con-

tractor could pull out the helix and make a smaller do for a larger one; is that right? Ans. That is correct; that is, I don't mean to infer that it was satisfactory from all viewpoints when that was done."

Plaintiff's witness Corrigan testified:

"Int. 17. In what manner did you find Circular Loom being used at the time you introduced Flexduct? Ans. I met numerous reports that in the installation of the material that the wireman or contractor frequently removed the helical coil or fiber from the interior of the tube.

"Int. 18. And in such instances what use was made of either member of the Circular Loom conduit? Ans. The helical coil or fiber was destroyed or concealed, so that the electrical inspector would not see it, and the remaining canvas cover was installed, admitting of the use of much larger wire than the prescribed size would admit of, if the helical coil had been retained. * * *

"Int. 46. During the period that workmen were removing the helical member from the Circular Loom after the canvas cover, as you call it, was separated, to what size of conduit having the helical member within it did such canvas cover correspond? Ans. The canvas on quarter-inch size could be used for three-eighths inch; three-eighths inch could be used for a half-inch.

"Int. 47. What was the result of such practice as that upon your trade? Ans. It was very much to our disadvantage.

"Int. 48. In what way? Ans. A contractor could buy a quarter-inch Circular Loom listed for six cents a foot and use it for a three-eighths listed at seven cents a foot."

The testimony of William P. Gannett, Jr., defendant's witness, on this point is very convincing. Mr. Gannett is a well-known and reputable citizen, whose testimony is entitled to full credit. He testified that during the period before 1896 he used the cover only of Circular Loom as a conduit for electric wires "a great deal."

"Int. 8. Under what circumstances and for what reason? Ans. The construction of lining itself was too imperfect to employ in the condition in which it was presented for use, and we were compelled to remove the spiral portion, and also for the reason that the matter of size was a worthy consideration at times."

He testifies to the use in this way of lengths of 200 feet in the Providence Athletic Association building.

Theodore P. Driver also says that often workmen would withdraw the inside spiral lining.

This practice is also described in the plaintiff's exhibit patent to Lutz & Sibley, No. 825,227, of 1906, in which reference is made to—

"the class of flexible conduits which have an insulating paper tube or lining inclosed within a fabric cover, usually woven or braided thereon.

"In installing such conduits workmen frequently find the wire to be inserted too large to readily enter the bore of the tube or lining, and they remove such paper tube or lining by pulling the same from its fabric cover, which naturally reduces the insulating qualities of the conduit with consequent risk and danger."

We have already pointed out that the feature of insulation is no part of the Osburn patented invention, since both by the specification and claims this is made nonessential.

The plaintiff lays stress upon evidence that the conducting wires were generally introduced into the Herrick cover before the conduit

was placed in the building; but the time or way in which the wires are introduced is a matter outside of the Osburn patent.

Much has been said in the case about "fishing" the wires into the conduit, but this may be done either before or after the conduit is placed in permanent position. A flexible conduit is no better adapted to fishing than a rigid conduit. The flexibility is useful in putting the conduit around curves, when installing it, but does not assist in fishing, once the conduit is installed. This is a feature which has been given undue emphasis, tending to a mystification of the issues. That the wire can be "fished" into the conduit shows merely that there are no objectionable obstructions or contractions in the conduit, whether fishing is done before or after the conduit is installed.

Though the Herrick outer tube does not anticipate the claims of Osburn's patent, yet it is a part of the practical art, well known to Osburn, which does directly anticipate much that is claimed for him by counsel to enlarge his patent and magnify his invention, and destroys what is now on the present hearing asserted to be the essential novelty of the Osburn patent:

"The means whereby the turns were held together and the obstructions of the Herrick conduit were prevented."

Herrick used the flexible woven tube in combination. Practical men used it alone, and not in combination, and when so used it had means for preventing the separation of the turns and any diminution of the size of the conduit due to separation of the turns. If Herrick's outer cover was not stiff enough, and did not have as much radial strength as was desirable, it was still capable of extensive and practical use, and its features cannot be claimed as a novelty brought into the art by Osburn. A single-wall woven tube, stiffened by compounds to such extent as made it of considerable practical use is in the art prior to Osburn, and the use of these features cannot be monopolized by him or claimed as his contribution to the art. A strain exerted upon the end of the spiral of this device will not separate its turns or diminish the size of the interior. This is equally true of the devices illustrated by drawing and described in the Bergman patent, No. 603,230, and in the Johns patent, No. 459,509.

To now ignore these patents would be a great injustice to the defendant. It is true that each discloses, besides woven tubes, braided or knitted tubes. But Herrick had used the woven tube, and Bergman and Johns both pointed out the use of fibrous materials, and a stiffening by compounds for woven as well as braided or knitted tubes.

That the removal of Herrick's spiral removed or lessened the insulation is a matter entirely immaterial to the case before us, in which the function of insulation forms no part of the claims in issue, and is made immaterial by the specification.

A defect of the plaintiff's argument is that it ignores all but Herrick's patent, excluding from the art of flexible electrical conduits all other patents for such conduits, and all practice before Osburn. Gannett and others improved upon Herrick, and obviated his defects when they pulled out his lining and availed themselves only of those qualities of his cover which were not only obvious, but were expressly

pointed out by Herrick. They abandoned, at the same time, a desirable feature of Herrick, namely, the stiffness due to the use of his spiral lining. But before Osburn the art had fully solved the problem of making a one-wall conduit which could not be dismembered nor stretched longitudinally, and with a lining for the tubing sufficiently smooth to permit the ready introduction of wires.

This differs from what the Circuit Court of Appeals considered was introduced into the art by Osburn only in one particular; i. e., in respect to the means for preventing collapse:

"A spiral having sufficient rigidity of structure to maintain a circumferential rigidity to the tube against the conditions of use under which the tube is employed."

This is means for preventing collapse of the tube, which is not due to separation of turns or dismemberment of parts. It is, of course, apparent that every woven tube presents more or less resistance to collapsing, and has a certain degree of radial strength. But it was pointed out by Mr. Gooding, plaintiff's expert, that where the warp and weft possess the same characteristics the invention of the patent in suit is not present. He says:

"Osburn certainly did not intend to try to cover a simple woven structure, such as had been old and well known for years, and in which the longitudinal and helical threads were alike."

As was stated in the plaintiff's brief on the former hearing:

"The essence of the patent in suit is a flexible tubular armor composed of a hard and resilient material like fiber made in helical form, combined with a series of longitudinal threads forming both a lining and cover or sheath, and also filling the spaces between the turns or coils of the fiber, as shown in the Gooding sketch."

After the users of Herrick's conduit had pulled out the helical lining, the art contained a tubular conduit, which was subject to improvement in case it did not have a sufficient degree of stiffness to prevent collapse. It needed no improvement to prevent stretching or dismemberment.

Osburn started with Herrick's spiral, the feature which was known in the art as suitable to prevent collapse of a conduit, and had the problem of preventing the extension of its turns, which he solved by the use of weaving, following Herrick in using weaving as a means for rendering a conduit nonextensible.

The object of producing a conduit that should be both nonextensible and noncollapsible could therefore be approached in three different ways:

A. Flexible conduits made upon circular looms and having these mechanical characteristics were old, and could, if suitable, be applied to protect conducting wires. Such conduits, if sufficiently flexible, nonextensible and noncollapsible, would present the mechanical structure of the claims of Osburn.

Upon the evidence at the former hearing it was found by the Circuit Court of Appeals that none of these structures then presented was suitable to answer the purpose of a flexible electric conduit, and those

were not regarded as sufficient on the question of anticipation. It follows, therefore, that none of these structures, if used for an electrical conduit, would infringe the patent in suit, and that these might be adapted to such use by means other than those covered by Osburn's patent.

B. The Herrick spiral member could be interwoven with flexible warps, thus preserving the old resistance to collapse and giving more resistance to dismemberment. The new result is integrity of the structure, and theoretically, though not in practice, the dispensing with an outer cover, or the use of braiding instead of weaving for an outer member. This was Osburn's way.

C. By using a woven tube having the same characteristics of Herrick's cover in respect to resisting dismemberment and separation of turns, but with both elements so modified and so combined with applied compounds as to render the whole tube sufficiently stiff to resist collapse while retaining sufficient flexibility.

Osburn testified:

"Int. 182. How generally were these compounds used for either rigid or flexible conduits at the time you made your invention? Ans. They were used generally in both rigid and flexible conduits; in fact, in all the conduits that I was familiar with at that time.

"Int. 183. What relation, if any, had the art of fire and garden hose to the art of electrical conduits, so far as you understood it, at the time you made your invention? Ans. I had never head of fire and garden hose having been used for conduit installations.

"Int. 184. What, if anything, in relation to the art of fire and garden hose, occurred to you at the time you made your invention? Ans. It didn't occur to me that any of these materials you have just mentioned were suitable for this purpose."

This seems to apply to compounds, as well as to woven hose.

It fully appears that the conception of making a flexible and noncollapsible tube for electric wires from woven cotton stiffened by compounds was distinct from Osburn's conception.

The Circuit Court of Appeals has given a very broad construction to the term "semiflexible" used in the Osburn patent. Claims of such breadth rarely have been framed or sustained since the decision of the Supreme Court in the Incandescent Lamp Patent Case, 159 U. S. 465, 16 Sup. Ct. 75, 40 L. Ed. 221. Nevertheless, it has read the claims with some limitation as to the material of the semiflexible element and its function in the completed tube. It must at least have sufficient rigidity of structure to preserve its form under the conditions of use.

I find in the opinion nothing inconsistent with a holding that it must perform the function of preventing radial compression and collapse of the completed tube under ordinary conditions of use.

It is not enough for the plaintiff to show that the defendant has produced a tube which as a whole is stiff enough to resist collapse; it must go further and show that this, in a substantial sense, is due to a helical member composed of material which in its properties substantially resembles the materials referred to in Osburn's specification. It must also show such difference in warp and weft that the function of preventing collapse can be traced to the weft.

The plaintiff recognizes to some extent this requirement, and contends that as a matter of fact the defendant's weft member has sufficient stiffness to give the required rigidity. On this issue it relies principally upon the affidavit of its expert, Gooding, based upon Exhibit A, showing a dissection of parts of defendant's tube. Great stress was laid by plaintiff's counsel upon this dissected tube, and upon the fact that, while the weft members showed an external coating of compound throughout their length, the warp members were only intermittently coated, due to the fact that the compounds did not penetrate to the interior of the tube.

But the fallacy of this argument is apparent. It is in the fact of dissection, which has destroyed the actual combination of parts existing in the defendant's structure. The dissected exhibit does not correspond to anything made, used, or sold by the defendant, and does not represent their actual device, nor the character or function of its elements. It is a "fallacious division of a unitary structure." Sporting Goods Sales Co. v. Haskell Golf Ball Co., 217 Fed. 407, 411, 133 C. C. A. 317. The dissection destroys the structural unity to which its qualities as a whole are due. This is apparent upon a comparison of the dissected portion of the tube with the undissected portion: The whole has a stiffness that is not found in the dissected members.

The plaintiff seeks to prove that the defendant's combination is the same as plaintiff's, by breaking up the defendant's combination and destroying the relation and functions of its parts. But the plaintiff, in my opinion, has failed in its attempt to prove that the stiffness of defendant's tube is in fact due to the rigidity of a helical member, or that its flexibility is due to the difference between the material of the helical member and that of the warps. The defendant has proved as a matter of fact that the stiffness of its conduit is produced by the application of compounds to a tube of soft, absorbent, cotton warps and wefts, which in themselves are not within the claims in suit.

It has also proved that as a matter of fact it is immaterial whether the weft is larger or smaller than the warp, and that the compounds, when applied, give the required radial strength to the entire tube, irrespective of differences in the comparative size of weft and warp, or in the relative amount of stiffening compound absorbed respectively by these two elements. It is also proved that in both types of tubes in evidence, those with a large weft and those with a small weft, the warp strands carry more of the stiffening compounds than the weft strands.

The testimony of J. A. Kennedy, superintendent of defendant's factory, explains this as follows:

"The warp strands cover the weft, and, there being more surface of the warp strand exposed to the compounds, it absorbs the compounds quickly, forming a small arc. The strands lock into the weft, which prevents the compounds from penetrating quickly."

It also appears that the compound was so applied that it should not penetrate into the interior of the tube and thus render it unsuitable for the introduction of a conductor. This is a feature referred to in the opinion of the Circuit Court of Appeals, but in another connection.

The fulfillment of this obvious requirement the plaintiff seeks to distort into a deliberate attempt to give to the·warps flexibility through an intermittent application of compounds, while giving the wefts semi-flexibility through the .continuous application of compounds. But this is an overingenious extension of the fallacious argument based upon the dissection of the defendant's tube, and in itself is fallacious.

The plaintiff, to support its argument, must show that the stiffness of the defendant's tube is due substantially to the wefts, and to a substantially greater extent than to the warps. It is proved, not only that the greater part of the stiffening compound is carried by the warps, but that each of the warps at the place where the compound is not applied is stuck to the weft, passing up over the side of the weft into the compound, over the weft, and still in the compound, until it reaches the inner face.

Dissection destroys all those connections which in the completed tube prevent freedom of movement of the warps at the places where the compound is missing. Therefore the flexibility of the dissected warp is something that is not found in the completed tube, and the argument, though superficially plausible, is found demonstrably unsound upon very slight examination.

The part of the defendant's warp which is between the turns of the weft is stiffened, and only a portion, which is interwoven with and associated with the weft, is free from the compound. This is the reverse of what is shown in Osburn's patent. In other words, the defendant's warp is stiffened at the points where the Osburn warps must be flexible, and is left unstiffened only at those parts where it is so firmly associated with the weft as to prevent it from performing the function of permitting movements between the adjacent turns of the weft.

The manner in which the stiffening is applied to the defendant's warps, therefore, destroys pliability, and does not assist the whole tube to be, in the language of Osburn's specification (page 1, lines 64 -66), "readily flexed, due to the relative movement permitted between the adjacent turns or convolutions," since the compound is applied at just the points where the warp should be flexible, to answer Osburn's requirements.

The plaintiff proposes as a crucial test the question whether, if the bulky weft member of the Plaintiff's Exhibit A should be interwoven with slender and intermittently compounded warp member identical with those exposed to view in Exhibit A, and combined in *precisely the same relation as set forth in the patent in suit*, would the product embody the invention of the patent in suit, as stated in the claims? But this clearly is not a crucial question, since such members are not so combined in defendant's tube. The question is fallacious. In order to combine the members as set forth in the Osburn patent, it would be necessary to reverse the order in which the parts of the warp are disposed in defendant's tube, and to bring the unstiffened portions of the warps between the turns, and not, as in defendant's device, upon the turns of the helical member at places where they are incapable of being bent, and where the walls of the helix obstruct their pliability.

The stiffening of the defendant's tube by immersing it after it is woven, thus making both. parts, weft and warp, stiff, and binding both together, does not result in the same relation of parts as in the Osburn patent, because at the very places where Osburn requires a pliable element—i. e., between the turns—the· defendant has stiffened the warps as much as, if not more than, the weft.

Furthermore, it is in evidence, from defendant's witness Kennedy, that the use of such a weft, as by dissection is exposed in Plaintiff's Exhibit A, would not render the entire tube stiff enough to meet the requirements of the Underwriters.

There can be no doubt of the right of the defendant to use tubes having the same materials for warp and weft; and, as they are the same before the compounds are applied, so they are the same after they are applied. The argument that the intermittent application of the compounds to the warp is for the purpose of making the warp a flexible, as distinguished from a semiflexible, member, is unsound, since stiffening is omitted only at those parts where the warp would not flex, and is applied and resists flexing at the very places where Osburn required flexibility.

We must therefore reject as fallacious the argument based upon the dissection of Exhibit A. The unity of the structure is destroyed by the dissection, and the so-called flexible warps are erroneously assumed to be flexible in the tube, because flexible when dissected.

The plaintiff's contention that the defendant's tube infringes opens up the question whether the Osburn patent, upon such a construction of its claims, is valid, in view of the special prior art of flexible conduits for electric wires.

It is, of course, still open to the defendant to contend that, if the claims of the Osburn patent are to be construed so broadly as to cover the defendant's new structure, they are invalid. This does not impeach the decision as to the validity of the patent, nor reopen the former question of infringement, but merely seeks to prevent undue extension of that decision to a new subject-matter.

In view of the defendant's proof that the stiffness of its new tubes is due to the compounds, and that this is so irrespective of the comparative size of warps and wefts, the Bergman patent, 603,230, and the Johns patent, 459,509, and the Herrick cover used with the spiral removed, acquire a new significance; for, though it may be held that they lack Osburn's specific element, which performs the function of preventing collapse, they disclose other means for stiffening the whole tube, and thus preventing its collapse. This method is now proved to be effective, even if it be assumed that the warps and wefts of those former structures are of the same size, or that the weft is smaller than the warp.

The plaintiff's expert, Gooding, testified, on the main case, as to the application of compounds to the Defendant's Exhibit Flexduct inner tube:

"That there is no difficulty whatever in applying suitable compounds to the exterior of the structure in such a manner that the same will not penetrate to the interior of the said conduit."

This would seem equally applicable to the tubes of Bergman and Johns. Obviously, in either of these constructions, the necessity of keeping the composition from forming obstructions in the interior would be apparent; and bad workmanship in this particular cannot be attributed to these patentees to minimize the disclosure of means for preventing the collapse of their tubes.

The contention that these devices do not anticipate of course must estop the plaintiff from claiming that these or equivalent structures infringe. Yet it would seem that, if the structure shown in Fig. 1 of the drawings of the Bergman patent were dissected in the same manner that defendant's tube is dissected in Plaintiff's Exhibit A, there would be found a structure having a helix stiffened throughout its length and giving some radial support against collapse. But it must be held that such a helical member is not the equivalent of the helical member of Osburn's patent, even though it gives some degree of resistance to collapse. For the same reason it must be held that the dissected helical element of defendant's tube is not the equivalent of Osburn's semiflexible member. The proofs entirely fail to show that, without that part of the compounds which is applied to the parts other than the helix, the defendant's conduit could resist collapse under ordinary conditions of use. Upon that point the testimony of the plaintiff's expert must be read with great caution, and can be given no liberality of interpretation. It does not squarely come up to proof that defendant's helix can do the full work of Osburn's helix, or that it offers more resistance to collapse than the other portions of the conduit. It might as well be read upon the Bergman helical member, if that were dissected.

The defendant's expert says that:

"It cannot be said that it alone is stiff enough to furnish the requisite resisting power to collapse."

And defendant's witness Kennedy, the practical manufacturer, testifies that such wefts would not make the tube stiff enough to meet the Underwriters' requirements.

The plaintiff has failed to sustain the burden of proof resting upon it upon this point; on the contrary, the preponderance of the testimony is with the defendant upon this issue of fact.

Furthermore, there is no separate element in the completed tube of the defendant which corresponds to Osburn's separate helix with sufficient space between its turns to permit flexing of the entire tube. All of the Osburn drawings show a spiral with its turns separated to an appreciable extent; the patentee saying of his tube:

"While being readily flexed, due to the relative movement permitted between the adjacent turns or convolutions."

This is an essential feature when a hard helical member is employed. Osburn's spiral is substantially that of Herrick, who says:

"By forming the lining as a spiral the requisite flexibility is secured, and this flexibility is increased by slightly separating the turns of the spiral."

I am of the opinion that the Osburn combination of two elements is a combination distinct in law and practically from that of the de-

fendant's conduit, which is composed of at least three essential ele-. ments. Osburn's combination is complete, and must be complete, without the use of waterproofing compounds. Though he may apply them externally, he does not rely upon them to complete the patented combination. The defendant's helical member is designed to cooperate with waterproofing compounds, thus following the prior art as shown in the patents to Bergman and Johns, and thus differing essentially in character and function from Osburn's helix. The weft threads are also designed to co-operate with a waterproofing compound. This waterproofing compound is an. essential element, having no counterpart in kind or function· in the Osburn patent conduit. It performs the functions of stiffening the whole conduit and of making it water-resisting. Such a combination of similar elements is in the prior art of electrical conduits. It contains absolutely nothing which was brought into the art by Osburn, but only that which unquestionably was in the art before Osburn.

The defendant has the right to improve the stiffness of prior art structures by increasing the bulk of woven tubes and their absorptive qualities, and by varying the character and mode of application of the water and fire resisting compounds because Osburn apparently never thought of doing this, and because he never devised or introduced into the art any novel means of stiffening a tube, but took what was already in that art; it being conceded that his helical element was old in the Herrick patent.

Plaintiff's counsel undertakes, upon his brief, to show that there is the same number of elements in defendant's conduit and Osburn's patented conduit; but the argument in the brief upon this point from such able and ingenious counsel seems a confession of weakness. It` does not meet, but disregards, the fact that, without the presence of a third element, which is not in, nor implied in, the claims in suit, as a means for performing the function of rendering the tube noncollapsible, the defendant's tube would be collapsible. It disregards also the function which this element performs in the whole tube, binding the parts firmly together ·and rendering the whole body of warps, when in place, as stiff and resistant to collapse as the whole body of weft members. It also disregards the fact that, when the compound is so applied that it stops short of penetrating the inner part of the tube, the result is a hard, cylindrical shell, in which the wefts and outer portions of the warps are firmly imbedded, but which shell owes its stiffness, continuity, and integrity to the third element—the compound. If it be said that there is left in the interior a cylindrical portion of unstiffened portions of warps, which does not contribute to the stiffness of the tube, this does not correspond in kind or in function to the flexible elements shown in the Osburn structure; for in that structure the warps are flexible between the turns of the weft, while in the defendant's structure they are at that point stiff, and so bound to the wefts as to destroy their flexibility.

The plain fact of the matter is that the stiffening is an essential element of the defendant's combination, and that for its use it becomes essential to discard a hard, nonabsorptive, helical member, like that

of Osburn, and to employ one of highly absorptive material, like that of Bergman, Johns, or Herrick. The conception is radically unlike Osburn's, and is old in the art. If this element is to be subtracted for the purpose of argument, it must be wholly subtracted, in which case defendant's tube will collapse. If it be theoretically retained upon the weft, and theoretically subtracted from the warp, it will obviously be an impractical structure, which, according to the defendant's testimony, will still collapse, and which is not made or used by the defendant.

But it is useless to follow further this argument, based upon a fallacious division of defendant's unitary structure.

[2] The present hearing illustrates even more fully than the former hearing the necessity of requiring a patentee to reasonably limit his claims, so that they shall embody and specify elements essential to his actual improvement in the art. The right of a patentee to exclude others from the use of old and familiar mechanical combinations and structures must be carefully restricted. The duty rests upon the courts to guard the rights of the public against that form of unjust monopoly which may result from sustaining highly abstract claims. The language of the Supreme Court in Carlton v. Bokee, 17 Wall, 463, 471, 21 L. Ed. 517, should be always in mind:

"We think it proper to reiterate our disapprobation of these ingenious attempts to expand a simple invention of a distinct device into an all-embracing claim, calculated by its wide generalizations and ambiguous language to discourage further invention in the same department of industry. * * * *"

An attempt to save such claims by a beneficent interpretation is not only contrary to well-established patent law, but a practical mistake. Patent claims are advisedly made by skilled solicitors, and if they choose to claim abstractions or high generalizations they must stand by them.

As was said in American Bell Tel. Co. v. National Tel. Mfg. Co. (C. C.) 109 Fed. 1043:

"The patent statutes require the patentee himself to claim and define his invention, so that the public may know its rights, and so that there shall not be imposed upon the courts the burden of constructing upon a hearing new claims from the interpretations that experts may place upon language of the most sweeping and general character."

To defend the use of such language it is not enough to say that nothing that corresponds to the words of this claim was used in a particular art before. It does not follow that everything coming after in the art to which these words may be applicable is an infringement.

An abstraction or a generalization never tells the whole story; it often excludes more of the real qualities of things than it expresses; it selects points of similarity in things which, from every practical point of view, may be dissimilar. The abstract term "pole" is applicable equally to things as remote as possible—the North Pole and the South Pole.

The claims in suit imply only mechanical requirements, but not all that is essential to the construction of a practical, usable conduit.

They should not be saved from anticipation by the rejection of prior devices which are similar in mechanical features, merely because such devices in other respects lack features of a practical conduit.

If the claims include only elements which relate to the same mechanical features as are found in prior devices they are presumptively in the generic art of tube manufacture. Only when modifications to meet requirements peculiar to a sub-art appear in the claims can it be said with any certainty that the invention is in a species art rather than still in the generic art. The genus includes the species, and their common features are in the same art. Only when those modifications necessary to special characteristics of the species are made can it be said that the device leaves the generic art and enters the species art, or sub-art. Rogers on Patents, p. 58.

[3] What is prior art is a matter that cannot be determined arbitrarily, nor merely by a restriction of the claim to a special use.

If the thing is old, and is applied to perform its old functions, it remains in the prior art, and cannot be made novel, in the sense of the patent law, merely because used in new surroundings that do not affect its character or mode of operation.

[4] The questions of invention and of infringement are not verbal questions, and neither can be determined by the test of the words used in the claims.

In Goodyear Shoe Mchry. Co. v. Spaulding (C. C.) 101 Fed. 990, it is said:

"Infringement should not be determined by a mere decision that the terms of a claim of a valid patent are applicable to the defendant's device. Two things are not necessarily similar in a practical sense because the same words are applicable to each. The question of infringement involves considerations of practical utility and of substantial identity, and therefore must be quantitative, as well as qualitative."

This language was quoted with approval by the Circuit Court of Appeals of the Second Circuit in Edison v. American Mutoscope & Biograph Co., 151 Fed. 767, 773, 774, 81 C. C. A. 391.

The defendant has met the plaintiff's contention that the stiffness of its tube is due to the use of a large weft rather than a small, by producing two tubes, one of which has a small and the other a large weft. To ordinary inspection they are equally stiff, and defendant's witnesses so testify. This effectually establishes the fact that the stiffness is due to the compounds alone, and not to the particular manner in which the soft cotton components of the tube are placed. The plaintiff does not meet this with evidence to the contrary, though there was full opportunity for it to do so, had it desired; and the omission to controvert this fact indicates that it prefers to take its chances of arguing the case on a theory of operation and as a matter of language rather than upon a comparison of these exhibits in respect to the functions actually performed by the compounds in them.

I find that, if construed so broadly as to include the defendant's device, the patent in suit is anticipated by Bergman. It would not involve invention to make his weft larger than the warps, or vice versa, in view of what was well known in the art of constructing woven

tubes. Furthermore, such differences are now proved to be immaterial.

Assuming the validity of the patent, and following the construction placed upon it by the Circuit Court of Appeals, the defendant's device does not infringe; for it does not contain the same elements as are required by the claims, and also because it is a distinct combination of different elements, which are different in function and in their mode of co-operation, as well as different in number. The patented claims are for two elements; the defendant's structure is of three, all essential, and all co-operating under a principle of combination different from that of Osburn's structure, but similar to that of prior patented devices in this special art. It does not contain a semiflexible, helical element corresponding to any one of the following descriptions thereof by the plaintiff:

"A tubular armor composed of hard and resilient material like fiber made in a helical form like the Herrick conduit."

"Winding a strip of hard and resilient material helically, so as to constitute a practically continuous wall and armor."

"A tubular structure formed by winding a strip so as to constitute a practically continuous wall and armor."

"Helically wound to form a practically continuous wall and armor."

"Primarily an armor to prevent injury to said wires."

"A protecting wall as nearly continuous as is possible and composed of tough, strong material."

"A standard of rigidity had been fixed and established by the Herrick tube and was recognized by persons in the art. It consisted of a continuous, rigid wall or armor."

"No helix or circumferentially extending members would be suitable, except such as formed essentially a tube, constituting an armor."

It does not contain a flexible element corresponding to Osburn's, since defendant's warps contain more stiffening than the helical member, and are most inflexible at the points where Osburn's device requires flexibility.

The stiffness of defendant's combination is no more (if as much) due to the material of the helical member than to the material of the longitudinal members.

And, finally, its third element, entirely absent in Osburn's structure, not only enters into the fibers of the two woven elements to stiffen them, but surrounds and binds them firmly together.

The defendant has presented a very full digest of prior art patents, showing the merger of arts, the interchangeability of conduits for different uses, and the development of the art of constructing conduits for electrical and other purposes from woven fabrics and stiffening compounds; and this should receive careful consideration in determining Osburn's merits as an improver and inventor, and the range of equivalents.

The extraordinary breadth of the plaintiff's present construction of his claims is shown by the fact that he seeks to exclude from an appropriate use, not only those products of the circular loom in which the weft member is stiffer than the warps, but also the products of those inventors who are seeking to construct tubing for mechanical uses, and for insulating and waterproofing purposes, by the use of .com-

pounds. Plaintiff in turn directs its claims at the use of weaving, and at the use of compounds, though both the art of weaving and the art of compounding had been combined in the flexible conduit art before his invention, and though he invented nothing in compounds. His mechanical claims are relied upon to include materials suitable because of fire or water resisting qualities, or because of economy in construction.

All this seems to me in the nature of a raid upon the proper territory of the manufacturers and users of circular looms, and of the manufacturers of tubings stiffened by compounds. It may not be inappropriate to suggest that letters patent for inventions are not intended to perform the function of letter of marque.

There still remains a word to say about the merits and scope of Osburn's invention, though this requires some repetition. A conduit which, if well made, answered the requirements of the art in all respects except resistance to violent dismemberment, was in the art— Herrick's conduit. Osburn's tube performs no function and answers no general requirement of the art that a well-constructed Herrick tube did not answer. This was flexible enough, and noncollapsible enough. Bergman's patent discloses a conduit which, if its drawings are followed, will resist dismemberment, and which, as is now proved, may be made stiff enough to resist collapse. There was no novel conception as to what was required or what would be useful. There was only a mechanical defect or weakness of structure to be mended or obviated.

The effective prevention of separation of the turns of a spiral by weaving was shown both in Herrick and in Bergman, and was fundamental to the product of the circular loom; and, what is of special importance, it was equally effective to this end, whatever the differences of warp and weft. What was accomplished by Osburn was not effective resistance to dismemberment broadly, since that was old in Bergman's illustrated woven tube and in Herrick's cover, but effective resistance to displacement of the turns of a spiral like Herrick's, an element that was itself to form a rigid, practically continuous wall or armor.

[5] Now it seems to me that it is hardly proper to consider the problem of preventing the separation of the turns of a special form of helix, and the mending of a defective construction of a device which is defective only in strength of construction, as a problem peculiar to the art of electrical conductors. That is the kind of a problem which a skilled mechanic is expected to meet rather as a detail of construction than as a problem peculiar to a particular art. Many defects in details of construction are remedied by mechanics who have only general mechanical skill, and who have had no part in the invention of the machine whose defective construction they remedy. For example, a mechanic who prevents the overrotation of a numeral wheel in a counting machine, by means of a stop, does not invent a counting machine, even though he was first to use a positive stop in a counting machine. In Felt & Tarrant Mfg. Co. v. Mechanical Accountant Co. (C. C.) 129 Fed. 386, it was held that, to prevent the excessive rota-

tion of a wheel by a stop, either positive or frictional, and to remove the stop to permit the further operation of the wheel, were features so common in mechanical construction that they cannot be monopolized for the purposes of any particular art, even though one is first to use them in that particular art.   See, also, Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 492, 493, 20 Sup. Ct. 708, 44 L. Ed. 856; Lovell Mfg. Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307.   Mending a known and specific defect and thereby restoring a part to its intended relation to other parts, and strengthening weakness of construction, do not, except in very unusual cases, entitle one to rank with inventors who have solved some problem peculiar to a special art.

One who was first to use in a flying machine a sailor's knot or a weaver's knot, or any other known means for more securely fastening together separate parts, or one who was first to use wood or brass in the art of flying machines, cannot by claiming that he was first to introduce these into the art of flying machines exclude subsequent inventors of flying machines from their birthright in ordinary materials and ordinary mechanical modes of construction.

Yet in this case we have claims to exclude manufacturers and owners of circular looms from an important part of the field of use to which their known products are applicable, by reason of the mechanical qualities of the products.   The circular loom is the result of the work of many inventors, and tubular weaving, like flat weaving, produces many products, all having the essential characteristics of interwoven warps and wefts, and longitudinal strength.

Tubular woven fabrics with a stiff weft, resisting collapse, being old, it is in my opinion entirely against the whole course of former decisions to exclude manufacturers of flexible tubular conduits from selling them for the use of inclosing conducting wires.   It is unreasonable.

While I am of the opinion that justice to this defendant requires a reconsideration of the main case, this, of course, can be done only by the Circuit Court of Appeals.   I must accept the decision of the Circuit Court of Appeals that the Osburn patent is valid, when its claims are so construed as to cover defendant's former combination. But this clearly does not conclude the questions of infringement raised in this case; neither does it conclude the defendant's contention that, if the claims are so broadly construed as to cover defendant's present device, they are invalid.

Certain objections to testimony were made, but do not require detailed discussion.

The Underwriters' rules are quite as admissible now as upon the main hearing.   They are business facts, and establish practical standards affecting practical use.   The plaintiff should be consistent; and, having relied upon them, the defendant has the same right.

The defendant's small weft construction is clearly admissible in contradiction of plaintiff's contention that the resistance to collapse is due to the stiffness of the weft rather than to the stiffness of the entire tube, or to the stiffness of the warps, and as showing that, ir-

248 F.—35

respective of the features upon which plaintiff relies, the two tubes of different construction are practically the same.

The defendant's witnesses were before me with their exhibits. They were intelligent and competent in their testimony as to the character of defendant's products, much of which is practically uncontradicted, though plaintiff had full opportunity to offer witnesses in contradiction, had it desired to do so.

The supplemental bill will be dismissed upon the ground of noninfringement.

A draft decree may be presented accordingly.